UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

CRAIG ALAN SUMMERS,

        Plaintiff,

v.                                        Case No. 18-C-32

TARGET CORPORATION,

        Defendant.

# DECISION AND ORDER GRANTING DEFENDANT'S
# MOTION FOR SUMMARY JUDGMENT

Claiming that his supervisor was the cause of anxiety/panic attacks he experienced at work, Plaintiff Craig Alan Summers sued his former employer, Target Corporation, for violating the Americans With Disabilities Act (ADA), 42 U.S.C. § 12101, *et seq.*, by failing to reasonably accommodate his disability by transferring him to another store and failing to engage in the interactive process to resolve his problem. Summers also alleges that Target's failure to transfer him to another store violated the Wisconsin Fair Employment Act (WFEA), Wis. Stat. § 111.31, *et seq.*, because it forced him to resign, thus constituting a constructive discharge. The court has jurisdiction over Summers' ADA claims pursuant to 28 U.S.C. § 1332 and supplemental jurisdiction over his state law claim under 28 U.S.C. § 1367. Currently before the court is Target's motion for summary judgment. In its motion, Target argues that Summers is not disabled for purposes of the ADA, Summers' accommodation request was not reasonable, Summers cannot bring an independent claim for failing to engage in the interactive process, and the WFEA does not provide for a private right of action. For the reasons that follow, Target's motion will be granted.

**BACKGROUND**

Summers joined Target around November of 2015. He completed his training at a store in Appleton and was then assigned to a store in Green Bay, Wisconsin. Summers' supervisor at the Green Bay store was Jessy Lundin. Summers had previously worked with Lundin at The Home Depot. Lundin had been terminated from The Home Depot and joined Target before Summers. Although Lundin was instrumental in helping Summers secure his position at Target, Summers did not wish to work alongside Lundin and did not think he would be under Lundin's supervision at the time he accepted the position at Target.

Summers began working at the Green Bay store in January of 2016. About a month later, Lundin approached Summers and requested that he keep the circumstances surrounding Lundin's termination at The Home Depot a secret and that he not discuss the matter with others. Also around this time Lundin recommended that Summers be promoted to a store team leader. During the next six months, the relationship between Summers and Lundin became strained as the result of certain interactions that occurred between the two at the store. For example, Lundin told Summers that a display in the sporting goods section for which Summers was partially responsible was not up to standard and "makes me want to go home and shoot off my [assault rifle]." Summers Dep., Dkt. No. 19-1 at 7:24–8:1. Lundin also referred to Summers as "the whitest black man that I know," *id.* at 10:24–25, and in a meeting with other employees said that Summers' choice for who should lead a particular store initiative was lousy and that as a result of the initiative's failure Lundin would not be able to afford presents for his kids and would have to live on welfare and food stamps.

In August of 2016 Summers was placed on a six-month development plan that he had to successfully complete in order to be promoted to a store team leader. Each month Summers was

to meet with Lundin to discuss his progress under the plan. On December 29, 2016, Summers met with Lundin for one such meeting. In the course of the meeting, Summers asked where things stood with the plan to which Lundin responded, "I knew you were going to come in here demanding about being promoted early and all that." *Id.* at 104:24–25. Lundin proceeded to outline some areas where he thought Summers needed to improve. The meeting concluded with Lundin asking Summers if he should contact the District Leader to tell him to prepare Summers' replacement.

Following this meeting Summers reached out to Ricardo Vargas, the district human resources manager, explained his concerns about working with Lundin, and expressed his desire to be relocated to a different store. Vargas informed Summers that if he transferred he would need to restart his development plan and encouraged Summers to remain at his current store.

When Summers came to work on January 2, 2017, for the first time after the meeting, he experienced rapid heart palpitations, shortness of breath, and dizziness, which resulted in him leaving for the day. Summers later texted Vargas, once more requesting that he be transferred to a different store. Two days later Summers spoke over the phone with Logan Rankin, the district team leader, about relocation to a different store. Summers was informed that he could either return to his current store or stop working at Target all together. Summers emailed Lundin on January 5, 2017, to inform him that he would not be in the following day because he was still experiencing the earlier symptoms.

On January 6, 2017, Summers awoke to heart palpitations and shortness of breath and made an appointment to see his primary care physician, Dr. Daniel Lemkuil, later that day. Dr. Lemkuil diagnosed Summers with anxiety, stress, palpitations, and panic disorders and prescribed anti-anxiety and anti-depressant medication. Summers also applied for medical leave that same day.

Target's policy required that his request be completed by a therapist, supported by proof of an actual disability, and approved by Target. In order to complete his medical leave request, Summers was also seen by Daniel Gesell, a licensed clinical therapist. The reports of Dr. Lemkuil and Gesell attributed Summers' conditions to the work environment at his current store and recommended relocation to a different store to treat his conditions. Summers' medical leave request was approved on January 18, 2017, effective as of January 6, 2017.

Over the course of the next three months Dr. Lemkuil and Gesell submitted the medical documentation required by Target in order for Summers to remain on medical leave. During this time, Summers reached out to members of Target's upper management and requested assistance with his situation and expressed a desire to be transferred to a different store. On April 10, 2017, Summers resigned from his position at Target. That same day Summers started in a position at an Aldi as a store manager-in-training that was in close proximity to the Target store at which he previously worked. Summers left the position after three days because his panic symptoms resurfaced.

Summers filed a charge of discrimination against Target with the Equal Employment Opportunity Commission (EEOC) on April 17, 2017. The EEOC concurrently filed the charge with the State of Wisconsin Department of Workforce Development, Equal Rights Division (ERD). On May 22, 2017, the ERD informed Summers that the EEOC would handle the matter. On September 15, 2017, the EEOC determined after investigating Summers' claims that "there was reasonable cause to believe that [Target] violated the ADA because it participated in a relationship which had the effect of subjecting its employee to discrimination when, through its agent, it failed to engage [Summers] in the interactive process and subsequently denied him reasonable accommodation" and

4

that "[Target's] action forced [Summers] to resign his employment." Dkt. No. 19-9 at 2. Summers initiated this lawsuit on January 8, 2018.

## LEGAL STANDARD

Summary judgment should be granted when the moving party shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In other words, the time and expense of the parties and the court should not be wasted on a trial when there are no material facts in dispute, one party is entitled to judgment on those facts, and thus there is nothing to try. In deciding a motion for summary judgment, all reasonable inferences are construed in favor of the nonmoving party. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (quoted source and internal quotation marks omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* Summary judgment is properly entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Parent v. Home Depot U.S.A., Inc.*, 694 F.3d 919, 922 (7th Cir. 2012) (internal quotation marks omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## ANALYSIS

Summers alleges that Target discriminated against him on the basis of his disability by failing to accommodate his disability under Title I of the ADA. The ADA prohibits employers from discriminating against qualified employees on the basis of a qualified disability. 42 U.S.C.

5

§ 12112(a). Discrimination under the ADA includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." § 12112(b)(5)(A).

A.     **Disability Under the ADA**

As an initial matter, Target challenges whether Summers has a disability under the ADA. Target claims that Summers is not disabled because he did not have an impairment that limited his employment in general and did not otherwise impair a major life activity. The term "disability" means with respect to an individual "a physical or mental impairment that substantially limits one or more major life activities of such an individual," "a record of such an impairment," or "being regarded as having such an impairment." 42 U.S.C. § 12102(1). "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." § 12102(2)(A).

> An impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting. Nonetheless, not every impairment will constitute a disability within the meaning of this section.

29 C.F.R. § 1630.2(j)(1)(ii). In determining whether an impairment substantially limits life activities, courts consider "1) the nature and severity of the impairment; 2) the duration of the impairment; and 3) the permanent or long-term impact resulting from the impairment." *Furnish v.*

6

*SVI Sys., Inc.*, 270 F.3d 445, 450 (7th Cir. 2001). "The plaintiff bears the burden of proof on this issue; she must be able to show that she is a 'qualified individual with a disability' in order to successfully prosecute an ADA claim." *Weiler v. Household Fin. Corp.*, 101 F.3d 519, 524 (7th Cir. 1996).

"[W]ith respect to the major life activity of working, 'substantially limits' must mean significantly restricts the ability to perform a class of jobs or a broad range of jobs in various classes." *Id.* at 525. "It is well established that an inability to perform a particular job for a particular employer is not sufficient to establish a handicap; the impairment must substantially limit employment generally." *Byrne v. Bd. of Educ., Sch. of W. Allis-W. Milwaukee*, 979 F.2d 560, 565 (7th Cir. 1992). The definition of "major life activity" in the regulations "cannot be interpreted . . . to include working at the specific job of one's choice." *Id.*

Summers' inability or unwillingness to return to work at the same Target store where Lundin works is not sufficient to establish a disability under the ADA because there are no indications that his ability to work at another location or in a similar class of jobs was impaired. Summers stated in response to an interrogatory that his disability "was solely and proximately linked to one singular cause, his continued employment at *one specific store* under *one specific manager*." Dkt. No. 24-1 at 6 (emphasis added). Summers' medical records also confirm that the extent of his inability or difficulty working was limited just to working at one Target store under Lundin rather than an inability to work in general. Dr. Lemkuil, Summers' primary care provider stated in his assessment that Summers was "[n]ot able to work in current environment but could with relocation," Dkt. No. 24-3 at 13, and generally found that his conditions were directly tied to a specific work environment. Similarly, Daniel Gesell, a licensed professional counselor that Summers saw, stated in his

7

recommended treatment plan that he does believe Summers' "current symptoms are circumstantial and a direct trigger from his work stress," Dkt. No. 24-3 at 29, and found that his difficulties stemmed from a particular work environment and would dissipate if he could work in a different environment. Although the environment at that particular Target store and working under Lundin caused Summers' stress, anxiety, and other symptoms, "a personality conflict with a supervisor or coworker does not establish a disability within the meaning of the disability law even if it produces anxiety and depression, as such conflicts often do. Such a conflict is not disabling; at most it requires the worker to get a new job." *Palmer v. Circuit Court of Cook Cty., Ill.*, 117 F.3d 351, 352 (7th Cir. 1997) (internal citation omitted).

In *Weiler v. Household Finance Corp.*, the Seventh Circuit rejected the argument that a person is disabled where the alleged disability is linked only to working alongside particular colleagues or supervisors in a particular job or work location. 101 F.3d 519, 525 (7th Cir.1996). As the Court explained in *Weiler*:

> [W]ith respect to the major life activity of working, 'substantially limits' must mean significantly restricts the ability to perform a class of jobs or a broad range of jobs in various classes. [Plaintiff] claims she can do her job, but not while being supervised by [a particular supervisor]. If [Plaintiff] can do the same job for another supervisor, she can do the job, and does not qualify under the ADA.

*Id.* (internal citation omitted); *see also Scott v. Kaneland Cmty. Unit School Dist. No. 302*, 898 F. Supp. 2d 1001, 1003, 1005–06 (N.D. Ill. 2012) (plaintiff-teacher failed to establish that severe attention deficit disorder and depression qualified as a disability because plaintiff was able to perform as a teacher, just not at his current school district because certain supervisors worsened his issues); *Pack v. Illinois Dept. of Healthcare & Family Servs.*, No. 13-cv-8939, 2015 WL 507555, at *3 (N.D. Ill. Feb. 5, 2015) ("Because Plaintiff asserts that she is capable of working, just not at

IDHFS where Stevenson is, Plaintiff has not sufficiently alleged that she is disabled under the ADA.").

That is precisely the situation in this case. Summers concedes he is capable of performing the tasks of his position, just not under the supervision of Lundin. Summers repeatedly sought transfer to other Target stores to perform the same job and does not allege that he would be incapable of performing his job under different supervision. Because Summers can do the same job for another supervisor, he is capable of working and is not disabled as that term is used in the ADA. *Weiler*, 101 F.3d at 525 ("If Weiler can do the same job for another supervisor, she can do the job, and does not qualify under the ADA."). Accordingly, the court finds that Summers' inability to work at a single Target store under one particular supervisor does not constitute a disability for purposes of the ADA.

Summers' assertion that he experienced the same symptoms when he went to work at the Aldi store in April of 2017 does not change the analysis. Summers contends that it was the fact that the Aldi store where he was assigned to work was within blocks of the Target store where he knew Lundin still worked that caused his anxiety. When he accepted the position, he thought he would be assigned to a store in the Milwaukee area, but later learned he would be assigned to a store in the Green Bay/Appleton area. It was "[t]he thought of returning to the same geographic environment [that] elicited another panic attack." Pl.'s Resp. in Opp'n to Def.'s Mot. for S.J., Dkt. No. 14 at 18. In other words, Lundin was the cause of his anxiety.

The clear teaching of *Weiler* is that the fact that the plaintiff is unable to work for a particular supervisor, whether because of anxiety or extreme dislike, is not a disability within the meaning of the ADA. "The major life activity of working is not 'substantially limited' if a plaintiff

9

merely cannot work under a certain supervisor because of anxiety and stress related to his review of her job performance." *Weiler*, 101 F.3d at 524. "'Substantially limits' means 'significantly restricts the ability to perform a class of jobs or a broad range of jobs in various classes.'" *Skorup v. Modern Door Corp.*, 153 F.3d 512, 514 (7th Cir. 1998) (quoting *Weiler*, 101 F.3d at 525). "'[A]n inability to perform a particular job for a particular employer' is not sufficient to establish a substantial limitation on the ability to work; rather, 'the impairment must substantially limit employment generally.'" *Weiler*, 101 F.3d at 524 (quoting *Byrne*, 979 F.2d at 565); *see also Vega v. Adult Probation Dep't. of Cook Cty.*, Nos. 98-3028, 99-1902, 1999 WL 1278006, at *2 (7th Cir. Dec. 29, 1999) ("Yet 'situational anxiety' is by definition 'situational': it is linked to the particular tasks and supervisors encountered in a particular job. A condition that prevents a person from doing a single job (or just working with one supervisor) does not meet the regulation's definition of a disability."). Summers has offered no evidence that the anxiety and panic attacks he claims Lundin has caused him to experience would limit his ability to work at any other job in any other location. To the contrary, Summers, his doctor, and his counselor all state that he can work in another location without Lundin as his supervisor. This is not what the ADA means by disability.

**B.      Reasonable Accommodation**

Because Summers has failed to offer evidence from which a reasonable jury could find he has a disability, his remaining claims fail as well. Without a showing of a disability, Target had no duty to accommodate his demand for relocation. Even if Summers' condition did amount to a disability, his request for a different supervisor at a different location would not be considered reasonable.

"Under the ADA, an employer must reasonably accommodate the known physical or mental limitations of an otherwise qualified individual with a disability, unless the accommodation would impose an undue hardship on the employer." *Weiler*, 101 F.3d at 525 (citing 42 U.S.C. § 12112(b)(5)(A)). Reasonable accommodations include "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9). "[T]o be entitled to an accommodation, a disabled employee must have a physical or mental limitation that prevents her from performing an essential function of the particular job at issue and 'there must be some causal connection between the major life activity that is limited and the accommodation sought.'" *Squibb v. Mem'l Med. Ctr.*, 497 F.3d 775, 785 (7th Cir. 2007) (quoting *Nuzum v. Ozark Auto. Distribs., Inc.*, 432 F.3d 839, 848 (8th Cir. 2005)).

Even if Summers' Lundin-induced anxiety was considered a disability, Target was not required to transfer Summers because his requested accommodation was unreasonable. "[A] conflict with a supervisor" that has led to "significant medical problems . . . [does] not mandate a transfer." *Bradford v. City of Chicago*, 121 F. App'x 137, 140 (7th Cir. 2005). The ADA does not require an employer to transfer an employer to work for a different supervisor or to transfer that supervisor. *Weiler*, 101 F.3d at 526. Although Summers argues that *Weiler* is distinguishable from the case at hand because the employer in *Weiler* took steps to accommodate the employee in different ways aside from transfer that were all rejected by the employee, the underlying principle that guided the *Weiler* Court's decision still applies here: "Weiler's solution is that she return to

11

work under a different supervisor. But that decision remains with the employer. In essence, Weiler asks us to allow her to establish the conditions of her employment, most notably, who will supervise her. Nothing in the ADA allows this shift in responsibility." *Id.* That is in essence what Summers is requesting; that Target transfer him to another location so that he can continue working in the same position under a different supervisor. The failure to assign or transfer an employee to work under a different supervisor does not violate the reasonable accommodation requirement of the ADA when the employee's disability is specifically tied to a particular supervisor and the employee's ability to work is inhibited only in connection with working for that supervisor. Although "the ADA does indeed mandate that an employer appoint employees with disabilities to vacant positions for which they are qualified, provided that such accommodations would be ordinarily reasonable and would not present an undue hardship to that employer," *EEOC v. United Airlines, Inc.*, 693 F.3d 760, 761 (7th Cir. 2012), here the requested accommodation is not reasonable because Summers is essentially trying to dictate who supervises him and refusing to return to work absent satisfaction of that demand. "An employer cannot 'reasonably accommodate' an employee who refuses to return to work." *Weiler*, 101 F.3d at 526.

Summers contends that, in addition to requesting a transfer, he also requested that changes be made to the store environment as a reasonable accommodation. The record, however, does not support this contention. In his responses to interrogatories, Summers stated he "was placed on an approved leave of absence by Target and he made a request for a reasonable accommodation—relocation to a different store. . . . [Summers'] doctor (Lemkuil) repeatedly made the same recommendation, relocation to a different store—the identical request Plaintiff made, in multiple forms to multiple people, before and after the filing of the EEOC complaint. Relocation

12

to another store was the *only* request for reasonable accommodation that Plaintiff made." Dkt No. 24-1 at 6–7 (emphasis added). Summers' doctors in essence supported his request for relocation: "[p]atient states that he cannot work in current place but could in another location," Dkt No. 29-3 at 11; "[n]ot able to work in current environment but could with relocation," *id.* at 13. Although there was a recommendation for a change in Summers' current work environment because it *could* result in working toward "full work functioning," *id.* at 16, it does not appear that Summers ever made that request directly to Target.

In addition, it does not appear that such a change in the current work environment would be feasible or reasonable. Summers stated in his deposition that a change in the environment was likely not possible given his discomfort with Lundin as well as others in positions similar to his, leading him to the conclusion that "leaving the store altogether became the best option, and that's the request that I would make . . . ." Dkt. No. 19-1 at 14. Further, given that Summers stated he was unable to work at the Aldi merely because of its close physical proximity to the Target store where Lundin worked, it seems unreasonable to expect that there is a possible change in environment that could occur absent the removal of Lundin and others that would have allowed Summers to return to that particular Target. And, as stated earlier, changing an employer's supervisor is not a reasonable accommodation. *See* ENFORCEMENT GUIDANCE: REASONABLE ACCOMMODATION AND UNDUE HARDSHIP UNDER THE AMERICANS WITH DISABILITIES ACT, 2002 WL 31994335, at *24 ("Does an employer have to change a person's supervisor as a form of reasonable accommodation? No. An employer does not have to provide an employee with a new supervisor as a reasonable accommodation.").

**C. Remaining Claims—Failure to Engage in Interactive Process and Constructive Discharge**

Summers concedes that an employer's failure to engage in the interactive process the ADA envisions being used to resolve differences is not an independent claim. Moreover, because he is not disabled, Target had no obligation to engage in such a process in any event. And Summers has failed to respond to Target's argument that the Wisconsin Fair Employment Act, Wis. Stat. § 111.321, does not create a private right of action apart from the administrative proceeding in the Equal Rights Division of the Department of Workforce Development. *See Sharp v. Stoughton Trailers, LLC*, No. 15-CV-598, 2016 WL 3102241 (W.D. Wis. June 2, 2016). Any argument to the contrary is therefore waived and Summers' WFEA claim is dismissed as well.

**CONCLUSION**

For the aforementioned reasons, Target's Motion for Summary Judgment (Dkt No. 12) is **GRANTED.** Accordingly, all of Summers' claims against Target are dismissed, and the Clerk is directed to enter judgment accordingly.

**SO ORDERED** this  14th  day of May, 2019.

s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court
